J-A29043-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ROBERT MANNING, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| WILLIAM KELLY, PAMELA KELLY, | : | |
| KELLYCARS, INC., NATIONAL | : | |
| BUSINESS BROKERS, INC., GPB | : | |
| HOLDING AUTOMOTIVE, LLC, GPB | : | |
| HOLDING LP, GPB AUTOMOTIVE | : | |
| MANAGEMENT, LLC, GPB CAPITAL | : | |
| HOLDINGS, LLC, AND LASH AUTO | : | |
| GROUP, LLC, | : | |
| | : | |
| APPEAL OF: WILLIAM KELLY, PAMELA | : | |
| KELLY AND KELLYCARS, INC. | : | |
| | : | |
| Appellants | : | No. 2040 WDA 2014 |

Appeal from the Order December 8, 2014
in the Court of Common Pleas of Allegheny County,
Civil Division, No. GD 14-010482

BEFORE: FORD ELLIOTT, P.J.E., BOWES and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED DECEMBER 23, 2015**

In this breach of contract dispute, William Kelly ("Kelly"), Pamela Kelly (collectively, "the Kellys"), and KellyCars, Inc. ("KellyCars") (collectively, "the Defendants") appeal from the Order granting the Motion for a preliminary injunction filed by Robert Manning ("Manning"). We affirm.

The trial court thoroughly set forth the relevant factual and procedural history underlying this appeal in its Pa.R.A.P. 1925(a) Opinion. **See** Trial Court Opinion, 5/27/15, at 1, 4-10. We adopt and incorporate the court's recitation herein by reference. **See id.**

Following hearings on Manning's Motion and Amended Motion for a preliminary injunction, the trial court entered an Order on December 8, 2014, granting preliminary injunctive relief. The Order states, *inter alia*, as follows:

> Manning [] is currently suffering, and will continue to suffer, immediate and irreparable injury, not otherwise compensable by monetary damages[. A]s a result of [the] Defendants['] … violation of the Restrictive Share Agreement ("RSA"), and the [] Defendants['] refusal to recognize Manning as a shareholder, injunctive relief is necessary to return the parties to the status quo as it existed at the time of the [] Defendants' breach of the RSA on November 20, 2013[,] and to prevent Manning from suffering immediate, substantial and irreparable injury, including the loss of his right to acquire the outstanding shares of KellyCars [hereinafter "the Kelly shares"] …; the loss of his ownership interest in KellyCars []; and further oppression through the attempted freeze out by the [] Defendants.

Order, 12/8/14, at 1-2 (unnumbered). Concerning the grant of injunctive relief, the Order provided the following, in relevant part:

1. The [] Defendants shall immediately cease and desist from all efforts and actions to convert the ownership of Manning's 125 shares of KellyCars [] from Manning to the [] Defendants.

2. The [] Defendants shall [continue] to recognize Manning as an owner of 125 shares of KellyCars [] stock and shall immediately provide Manning with accounting reports, information and records, including balance statements and profit and loss statements.

3. The [] Defendant[s] shall immediately cease all efforts to sell the Kelly shares.

4. The [] Defendants shall immediately cease all efforts to sell the assets of KellyCars [].

5. The [] Defendants shall immediately comply with the procedure detailed in Section 2.3 of the RSA, which

provides Manning with the opportunity to purchase the Kelly shares[,] and … [t]he [] Defendants shall order an appraisal of KellyCars[] ….

*Id.* at 2-3, ¶¶ 1-5 (unnumbered).

The Defendants filed a timely Notice of Appeal.[1] In response, the trial court ordered the Defendants to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The Defendants timely filed a Concise Statement, which raised sixteen separate issues on appeal. The trial court then issued a Pa.R.A.P. 1925(a) Opinion.

On appeal, the Defendants present the following issues for our review:

1. Did the trial court err when it found that [the] Defendants … violated the … []RSA[] by failing to provide … Manning [] with (1) written notice of [Kelly's] intention to sell the Kelly[] shares; (2) an appraisal; and (3) an opportunity to purchase the Kelly[] shares, when credible record evidence indicates otherwise, and when Manning made multiple judicial admissions that he received written notice of Kelly's intention to sell [the Kelly] shares[,] and that Kelly had the option to provide [Manning] with a per[-]share value of KellyCars [], in lieu of an appraisal?

2. Was any alleged breach of Section 2.3 of the RSA by the [] Defendants a material breach as a matter of law[,] when Manning was given all of the financial information necessary to ascertain the per[-]share value of [KellyCars,] and multiple opportunities to purchase the Kelly[] shares before Kelly attempted to sell [the Kelly] shares to a third party, after having given Manning written notice of his intention to do so?

3. Did Manning waive his rights pursuant to Section 2.3 of the RSA by (1) failing to ever request an appraisal; (2)

_____

[1] We have jurisdiction over this appeal by virtue of Pa.R.A.P. 311(a)(4), which provides that a party aggrieved by an order granting a preliminary injunction may appeal the order as of right.

- 3 -

consenting to Kelly's efforts to sell [the Kelly] shares to the Lash Automotive Group, LLC[,] and GPB Capital Holdings, LLC ("Lash/GPB"); and (3) voluntarily participating in negotiations with Lash/GPB about the terms of his continued employment and retention of his equity interest in [KellyCars]?

4. Did Manning waive his rights to assert that the [] Defendants' failure to obtain an appraisal upon receipt of the Lash/GPB November 20, 2013 offer to purchase the Kelly[] shares constituted a material breach of the RSA[,] given his continued performance and acceptance of the benefits under the RSA through June 2014?

5. Does the doctrine of estoppel preclude Manning from claiming breach of the RSA?

6. Did Manning demonstrate that greater injury would result from refusing the mandatory injunctive relief than from granting it?

7. Should Manning have been required to post a sufficient injunction bond to cover the difference in the value of Kelly's 75% ownership interest in [KellyCars] as of November 2013[,] and the date of the actual sale of the Kelly[] shares to Manning that is contemplated in paragraph 5 of the appealed Order[,] based upon the uncontroverted evidence of record?

Brief for Appellants at 4-6 (footnote omitted).

Our scope of review in preliminary injunction matters is plenary. *Warehime v. Warehime*, 860 A.2d 41, 46 n.7 (Pa. 2004). Our standard of review of a trial court's order granting preliminary injunctive relief is "highly deferential." *Id.* at 46 (citation omitted). "This highly deferential standard of review states that in reviewing the grant … of a preliminary injunction, an appellate court is directed to examine the record to determine if there were any apparently reasonable grounds for the action of the court below." *Id.*

(citation, footnote, and internal quotation marks omitted). In order to obtain preliminary injunctive relief, the party must establish all of the following "essential prerequisites":

> 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited to abate the offending activity; and, 6) that a preliminary injunction will not adversely affect the public interest.

*Id.* at 46-47 (citation and quotation marks omitted). The burden of proof is on the party requesting the preliminary injunctive relief. *Id.* at 47.

An injunction can be either preventative or mandatory in nature. ***Overland Enter., Inc. v. Gladstone Partners, LP***, 950 A.2d 1015, 1019 (Pa. Super. 2008). "While the purpose of all injunctions is to preserve the status quo, pr[eventative] injunctions do this by forbidding an act or acts[,] while mandatory injunctions command the performance of some specific act that will maintain the relationship between the parties." ***Ambrogi v. Reber***, 932 A.2d 969, 974 (Pa. Super. 2007). Mandatory injunctions are subject to "greater scrutiny," and must be issued "more sparingly" than preventative injunctions. ***Overland Enter., Inc.***, 950 A.2d at 1019 (quoting ***Mazzie v. Commonwealth***, 432 A.2d 985, 988 (Pa. 1981) (stating that "in reviewing

the grant of a mandatory injunction, we have insisted that a clear right to relief in the plaintiff be established.")).

In the instant case, the trial court's Order granted Manning both preventative and mandatory preliminary injunctive relief. *See* Order, *supra*, 12/8/14, at 2-3, ¶¶ 1-5 (unnumbered). Accordingly, to the extent that the Defendants challenge the mandatory injunctive relief awarded, we will review such challenge under the stricter, "clear right to relief" standard. *See Mazzie, supra*.

We will address the Defendants' first six issues simultaneously, as they are related. In their first issue, the Defendants argue that the trial court erred in determining that Kelly had breached the RSA by failing to give Manning written notice of Kelly's intent to sell the Kelly shares, an appraisal, and an opportunity to purchase the Kelly shares. *See* Brief for Appellants at 26-27, 32-41. According to the Defendants, "Manning was advised of, and effectively consented to, Kelly's listing for sale of [the Kellys'] interest in [KellyCars], a step Kelly took only *after* Manning was unable to put together a market-value offer for [the] Kelly[] shares." *Id.* at 26 (emphasis in original); *see also id.* at 32-33 (asserting that Kelly's forwarding to Manning a "Listing Agreement" that Kelly had executed in September 2013, concerning the proposed sale of KellyCars to Lash/GPB, constituted written notice of Kelly's intent to sell the Kelly shares under the RSA). The Defendants further contend that Kelly complied with Section 2.3 of the RSA when he gave Manning a per-share value of KellyCars (*i.e.*, via Kelly's

discussions with Manning and the provision to Manning of KellyCars financial statements) in lieu of an appraisal.[2]  ***See id.*** at 33-37; ***see also id.*** at 36 (asserting that "the RSA provided Kelly with the option – not the requirement – of an appraisal.").  The Defendants additionally challenge the trial court's failure to acknowledge that they had provided Manning with multiple opportunities to purchase the Kelly shares, but Manning was unable to complete the transaction.  ***See id.*** at 37-39; ***see also id.*** at 45 (asserting that "[i]t is undisputed that Kelly and Manning engaged in a number of discussions about the value of [KellyCars]."); ***id.*** at 39-40 (describing instances wherein Kelly allegedly disclosed financial information concerning KellyCars to Manning and "potential backers" that Manning was coordinating with in attempts to purchase the Kelly shares).

> In their second issue, the Defendants assert that
>
> [e]ven if it could be found that Kelly breached the RSA by failing to give Manning an appraisal, such breach could not possibly be deemed "material."  The sole reason for an appraisal was to give Manning a sufficient understanding of the per[-]share value of the Kelly[] shares so that he could fashion an appropriate offer.  Kelly, in fact, provided Manning with all of the financial data necessary to ascertain per[-]share value.

***Id.*** at 44-45; ***see also id.*** at 44-49 (arguing, at length, that any alleged breaches by Kelly were not "material"); ***see also*** Reply Brief for Appellants at 20 (asserting that "Kelly did not 'reject' any offer from Manning [to purchase the Kelly shares], as he now alleges, with the exception of the

---

[2] The Defendants concede that they never provided Manning with an appraisal.  ***See*** Brief for Appellants at 37.

- 7 -

June 2013 lowball offer. Rather, Manning could not amass the financing to present a subsequent offer[,] much less an offer that matched the per[-]share value.").

In their third and fourth issues, the Defendants assert that Manning, by his actions, waived his rights to written notice and an appraisal under the RSA. **See** Brief for Appellants at 49-50; **see also id.** at 51-52 (setting forth, at length, Manning's actions that allegedly "overwhelmingly demonstrate[d] that Manning waived his rights under Section 2.3 of the RSA," including, *inter alia*, that Manning had offered to purchase KellyCars without an appraisal, and participated in negotiations to sell KellyCars to Lash/GPB); **see also** Reply Brief for Appellants at 22 (asserting that Manning's "failure to [previously] invoke the Section 2.3 rights he now asserts …[,] despite the numerous opportunities to do so[,] clearly shows that Manning waived his rights under that provision.") (footnote omitted). Additionally, the Defendants argue that "Manning [] waived any right to assert a November 2013 violation of Section 2.3 of the RSA because he continued to behave as though the RSA was in effect for the remainder of 2013[,] and until mid-June 2014, when he finally filed this lawsuit." Brief for Appellants at 56; **see also id.** at 57 (stating that "Manning took no action to address Kelly's purported breach of Section 2.3 of the RSA[, in November 2013,] for seven months. During this time, Manning continued to accept the benefits of the RSA[,]" *i.e.*, he still received tax distributions (emphasis omitted)).

In their fifth issue, the Defendants argue that the trial court erred in failing to rule that Manning was equitably estopped, by means of his conduct, from asserting a claim for the Defendants' alleged breach of the RSA. *Id.* at 58; *see also id.* at 59-61 (setting forth, at length, Manning's conduct upon which Kelly purportedly relied, to his detriment); *see also* Reply Brief for Appellants at 29 (asserting that "the specific contractual breach that Manning alleges here … would not have occurred had Manning not consented to it, or otherwise invoked the rights he now claims.") (emphasis omitted).

Finally, the Defendants argue that the trial court erred in determining that the injury to Manning, in the absence of injunctive relief, is greater than the harm to the Defendants, since (1) after Manning's departure from KellyCars in March 2014, KellyCars' profits "dramatically improved"; and (2) "[t]hus, if the [] Defendants are compelled to offer the Kelly shares to Manning at November 2013 values, Manning stands to purchase the Kelly shares at a deep discount, thereby costing Kelly the true current value of [the Kelly] shares." Brief for Appellants at 62.

In its Pa.R.A.P. 1925(a) Opinion, the trial court concisely addressed the Defendants' above-mentioned claims, discussed the relevant law and all of the "essential prerequisites" for the granting of an injunction set forth in *Warehime, supra*, and concluded that (1) the Defendants had committed a material breach of the terms of the RSA; (2) Manning did not waive his rights under the RSA, nor should he be estopped from claiming breach of

contract; and (3) Manning met all of the prerequisites to entitle him to injunctive relief. *See* Trial Court Opinion, 5/27/15, at 11-16. Our review discloses that the trial court's sound analysis is supported by the record and the law, and we discern no error of law or abuse of discretion by the trial court in granting preventative and mandatory[3] preliminary injunctive relief. Accordingly, we affirm based on the trial court's rationale concerning the Defendants' first six issues. *See id.*[4]

In their final issue, the Defendants challenge the trial court's failure to require Manning to post a bond in connection with the preliminary injunction. *See* Brief for Appellants at 6, 62-63. However, this issue is moot in light of the trial court's foregoing analysis in its Opinion: "[the] Defendants are correct in their position that a bond is required. Therefore, with the issuance of this [O]pinion[, the trial court is] also issuing an order scheduling a

---

[3] To the extent that the trial court granted mandatory injunctive relief, we conclude that Manning established a "clear right" to such relief at the trial court level. *See Mazzie, supra.*

[4] As an addendum, we observe that, in multiple portions of their Argument, the Defendants challenge the trial court's credibility findings. *See, e.g.*, Brief for Appellants at 38, 39 n.3, 40, 52, 53. This Court, however, may not disturb the fact-finder's credibility determinations. *See Gillingham v. Consol Energy, Inc.*, 51 A.3d 841, 861 (Pa. Super. 2012) (observing that the fact-finder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses). Moreover, to the extent that the Defendants allege that they gave written notice to Manning of Kelly's intent to sell the Kelly shares by means of the September 2013 "Listing Agreement," this claim is waived because the Defendants never raised it in the trial court. *See* Pa.R.A.P. 302(a) (stating that a claim cannot be raised for the first time on appeal). Nevertheless, even if this claim was not waived, we determine that it lacked merit as being unsupported by the record and the language of the RSA.

hearing on an appropriate bond in this case." Trial Court Opinion, 5/27/15, at 16.[5]

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2015

---

[5] Moreover, the Defendants state in their Reply Brief that the trial court subsequently entered an Order imposing an injunction bond, and that they intend to appeal the Order, believing the amount of the bond imposed to be inadequate. **See** Reply Brief for Appellants at 30. Accordingly, this issue is not properly before us at this time.

# ∾ THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

ROBERT MANNING,

      Plaintiff,

  v.

WILLIAM KELLY, PAMELA KELLY,
KELLYCARS, INC., NATIONAL
BUSINESS BROKERS, INC., GPB
HOLDINGS AUTOMOTIVE, LLC,
GPB HOLDINGS, LP, GPB CAPITAL
HOLDINGS,LLC and LASH AUTOMOTIVE
GROUP, LLC,

      Defendants.

CIVIL DIVISION

**G.D. 14-010482**

HON. CHRISTINE WARD

**OPINION**

COPIES SENT TO:
*Counsel for Plaintiff:*
James R. Hankle, Esquire
Christopher Passodelis, Esquire
Christopher J. Davis, Esquire
SHERRARD GERMAN & KELLY
Two PNC Plaza, 28th Floor
Pittsburgh, PA 15222

*Counsel for Defendant:*
Jordon M. Webster, Esquire
Kate R. Paine, Esquire
BUCHANAN INGERSOLL &
ROONEY, P.C.
One Oxford Centre, 20th Floor
Pittsburgh, PA 15219

Kip Schwartz, Esquire
SCHWARTZ & ASSOCIATES, PLLC
1010 Wisconsin Avenue, N.W. Ste. 540
Washington, D.C. 20007

Robert J. Behling, Esquire
DAPPER BALDASARE BENSON
BEHLING & KANE, P.C.
Four Gateway Center, 10th Floor
444 Liberty Avenue
Pittsburgh, PA 15222

James A. Prestiano, Esquire
631 Commack Road, Suite 2A
Commack, NY 11725

FILED

(94)

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

ROBERT MANNING,

        Plaintiff,

        v.

WILLIAM KELLY, PAMELA KELLY,
KELLYCARS, INC., NATIONAL
BUSINESS BROKERS, INC., GPB
HOLDINGS AUTOMOTIVE, LLC, GPB
HOLDINGS LP, GPB AUTOMOTIVE
MANAGEMENT LLC, GPB CAPITAL
HOLDINGS, LLC, and LASH
AUTOMOTIVE GROUP, LLC,

        Defendants.

CIVIL DIVISION

G.D. No. 14-010482

Hon. Christine Ward

## OPINION

This is a breach of contract action. Plaintiff, Robert Manning ("Manning") alleges, *inter alia,* that defendants, William Kelly, Pamela Kelly and KellyCars, Inc., ("Kelly Defendants") breached a Restrictive Share Agreement ("RSA") between the parties by refusing to provide Manning with an opportunity to purchase KellyCars, Inc. ("KellyCars"), before negotiating for its sale to a third party. Plaintiff has filed a motion for a preliminary injunction. Plaintiff asks this Court to enforce the RSA and require the Kelly Defendants to provide Manning with an opportunity to purchase KellyCars. An evidentiary hearing was held before this court on November 17th, 18th and 24th, 2014. The only question before the Court at this time is whether the Kelly Defendants breached the RSA and, if so, whether Manning is entitled to injunctive relief. Based on the evidence presented, this Court found that Manning satisfied his burden of proof and, therefore, granted his motion.

1

## I.  CONCISE STATEMENTS OF ERRORS ON APPEAL

The Kelly Defendants have filed a Concise Statement of Errors Complained of on Appeal, asserting the following errors:

1. By issuing the requested mandatory preliminary injunction, in that Plaintiff Robert Manning ("Plaintiff" or "Manning") failed to put forth the requisite strong showing of a clear right to such relief;

2. By issuing the requested preliminary injunction, insofar as Plaintiff failed to establish that he was suffering, and would continue to suffer, immediate and irreparable injury not otherwise compensable by monetary damages;

3. By issuing the requested injunction, insofar as Plaintiff failed to demonstrate that greater injury would result from refusing the injunction than from granting it;

4. By failing to require Plaintiff to post an injunction bond in an amount sufficient to cover the difference in the value of the Kelly's 75 percent ownership interest in KCI ("the Kelly Shares") between November 2013 and the date of the sale of the Kelly Shares to Plaintiff that is contemplated in Paragraph 5 of the Appealed Order;

5. By issuing the requested preliminary injunction, in that Plaintiff is unlikely to prevail on the merits of his claims;

6. To the extent it found that Section 2.3 of the Restrictive Share Agreement ("RSA") obligated Kelly to provide Plaintiff with an appraisal, given Plaintiff's admissions that Kelly was required to provide Plaintiff with "an appraisal or otherwise provide a per share value of KellyCars, Inc.," along with an opportunity to purchase the Kelly Shares;

2

7. To the extent it found that Plaintiff had not waived his rights pursuant to Section 2.3 of the RSA by voluntarily and actively participating in negotiations with the Lash Auto Group and the GPB entities ("Lash/GPB") about the terms of his continued employment, failing to object to the Kellys' negotiations with Lash/GPB to buy the Kelly Shares, failing to request or demand an appraisal and that Kelly sell his shares to Plaintiff;

8. To the extent that it concluded that the doctrine of estoppel did not preclude Plaintiff from claiming breach of the RSA;

9. To the extent that it concluded that any alleged breach of Section 2.3 of the RSA by the Kelly Defendants was a material breach as a matter of law, insofar as Plaintiff could calculate the pre share value of the Kelly Shares and admits that he was given multiple opportunities to purchase the Kelly Shares;

10. By issuing the requested preliminary injunction because Plaintiff has failed to demonstrate that the mandatory injunctive relief is reasonably suited to abate the alleged offending activity, in view of Plaintiff's admission and the Court's own finding in Paragraph 8 of the Appealed Order that Plaintiff wishes to sell his shares as part of the dealership;

11. To the extent that it concluded that the Kelly Defendants were attempting to convert ownership of Plaintiff's 125 shares of KCI;

12. To the extent that it found that the Kelly Defendants oppressed or attempted to "freeze out" Plaintiff;

13. To the extent that it concluded that Plaintiff did not waive his right to assert that the Kelly Defendants' failure to obtain an appraisal upon receipt of the GPB

3

Entities' November 20, 2013 offer to purchase the Kelly Shares constituted a material breach of the RSA by his continued performance and acceptance of benefits under the RSA through June 2014;

14. To the extent that it found that Plaintiff is the rightful owner of 125 shares of KCI stock after June 20, 2014;

15. By issuing the requested preliminary injunction, because such injunction was broader than necessary for Plaintiff's interim protection in that it requires the Kelly Defendants to obtain an appraisal and sell the Kelly Shares to Manning at the appraised per-share value, thus effectively granting permanent relief following a hearing on Plaintiff's motion for preliminary injunction; and

16. By issuing the requested preliminary injunction when Plaintiff failed to meet his burden of showing that an injunction was necessary to preserve the status quo.

## II  FACTS

The following facts were adduced during the hearing held in this matter on November 17th, 18th and 24th, 2014.

Defendant William Kelly ("Kelly") has been the corporate President and Treasurer of KellyCars, a Chrysler dealership, since November of 2008. Defendant Pamela Kelly has been the corporate Vice President and Secretary. Manning was hired as General Sales Manager for Kelly Cars on April 9th, 2011. Soon after, he was promoted to General Manager.

In 2012, Manning and Kelly began to negotiate for the sale of some KellyCars stock to Manning. Their negotiations culminated in an agreement which provided that Manning would purchase 125 shares of KellyCars stock for $275,000. Manning and Kelly executed three separate agreements: (1) The Share Purchase Agreement ("SPA"); (2) The Restrictive Share

4

Agreement ("RSA"); and (3) The Employment Agreement. The parties executed the Employment Agreement on June 20th, 2012 and the other agreements on June 23, 2012. Manning purchased the shares on June 23rd, 2012. After he purchased the shares, he owned 25% of the shares of KellyCars, with Kelly and Mrs. Kelly owning the remaining 75%. In January of 2014, Mrs. Kelly conveyed her shares to Kelly, making him the majority shareholder.

The RSA provided that, if the Kellys subsequently decided to sell their shares in KellyCars to a third party, Manning would be provided the first opportunity to purchase the shares. Specifically, Section 2.3 of the RSA provides, in pertinent part:

> If at any time Kelly wishes to sell any or all of their shares, or KellyCars desires to sell all or substantially all of the assets of the Business, Kelly or KellyCars, as applicable, may obtain an appraisal of KellyCars by a qualified independent appraiser with experience in appraising new and used automobile sales and service dealerships (the "Appraisal"). The Appraisal will determine the Per Share value of KellyCars which will be a value equal to the value of the entire Business, without discount for lack of control or marketability or any other such discount, divided by the total of all outstanding shares in KellyCars. If Kelly or KellyCars wish to sell their Shares or otherwise sell the Business at the price determined in such Appraisal or otherwise, they shall deliver to Manning written notice thereof together with a copy of the Appraisal. Manning shall have the right for a period of sixty (60) days after receipt for the Appraisal to purchase all of Kelly's Shares for an amount equal to the Per Share Value multiplied by the number of Kelly's Shares ("the Purchase Price").

The RSA further provides that Manning would be required to tender 75% of the total purchase price to Kelly at the time of the sale. The remaining 25%, according to the RSA, would be financed by a note from Kelly, and secured by the shares Manning purchased. In the event Manning did not purchase the shares, Section 2.3 of the RSA provides that:

> If Manning does not exercise his option to purchase the Shares Kelly shall thereafter be free to sell any or all of the Shares or the assets of KellyCars at any time during the next eighteen (18) months, subject to Section 9 of this Agreement. Any such sale

5

subsequent to Manning's offer shall not be made for a purchase price less than the value of the Business as determined in the Appraisal. If no binding agreement of sale between either or both of Kelly and KellyCars and a third party is executed during that eighteen (18) month period, Manning's right of first offer under this Section 2.3 shall be reinstated.

At Section 9, the RSA specifies Manning's rights in the event Manning does not exercise his option to purchase KellyCars and Kelly negotiates a sale to a third party. Specifically, Section 9 provides that:

If after having complied with the requirements of Section 2.3 of this Agreement, Kelly or KellyCars, as applicable sets forth in a signed notice delivered to KellyCars and Manning, their desire to effect a sale of KellyCars, then Manning (whether in his capacity as a shareholder, director, member of a board, committee or otherwise) shall consent to, vote in favor of and raise no objections against, such sale, and shall authorize KellyCars' management to take all actions reasonably necessary to effect such sale and, if such sale is structured as a sale of stock, Manning shall agree, and hereby does agree, to sell his Shares on the terms and conditions approved by Kelly; provided the following conditions are satisfied:

9.1 Upon the consummation of such sale of KellyCars, all of the shareholders shall receive the same form and amount of consideration per share, or if an option is given as to the form or amount of consideration, each such shareholder will be given the same option as the other shareholders owing Shares.

9.2 In the event such sale of KellyCars is the sale of stock (excepting only sales of Shares to members of Kelly's family), each shareholder shall be entitled to participate based on such person's pro rata share within the class of stock being sold.

On June 20, 2012, the parties also executed the Employment Agreement. The Employment Agreement provides in Section 1 that "KellyCars hereby employs Manning in the capacity of a general manager and Vice-President, and Manning hereby accepts such

6

employment and agrees to serve KellyCars in such capacity subject to and upon the terms and conditions set forth herein." The Employment Agreement provided that Manning's employment could be terminated for any reason or no reason upon ninety (90) days written notice. If Manning was terminated prior to the second anniversary of the RSA, or June 23 2014, the RSA required Manning to transfer his KellyCars shares to the Kellys, in exchange for $275,000.00.

In November, 2012, Kelly decided to replace Manning as General Manager of KellyCars and arranged for two advertisements to be placed in local newspapers seeking candidates. No suitable candidate was found at that time. Manning was not aware of Kelly's attempts to replace him. In the Spring of 2013, Manning advised Kelly he would like an opportunity to purchase KellyCars. Kelly then ceased his efforts to replace Manning.

Kelly contacted Jeff Rochwarger, the senior vice president of Defendant National Business Brokers ("NBB") in February of 2013 to discuss identifying potential third party purchasers of KellyCars. Kelly also forwarded to Mr. Rochwarger financial reports of KellyCars. Rochwarger and Kelly met at the National Automobile Dealers Association conference in Florida on or about February 8th, 2013. Rochwarger and Kelly continued their discussions after the conference.

During this period, Kelly and Manning also discussed Manning's desire to make an offer to purchase KellyCars. Kelly and Manning discussed the value of KellyCars and agreed that the overall value would be calculated by adding the value of the hard assets to the blue sky value. Manning had access to the KellyCars financial statements and he was able to discern the value of the hard assets from the financial statements. In June 2013, Kelly sent to Manning an article which indicated that Chrysler dealership blue sky value was 3-4 times adjusted net earnings. In June 2013, Manning made a written offer to purchase KellyCars. The Kellys

7

rejected Manning's offer because it was too low and required the Kellys to finance the entire transaction. Manning did not request an appraisal of KellyCars at this time.

In September of 2013, Rochwarger notified Kelly he had a potential third party buyer for KellyCars. Rochwarger did not, at that time, identify the buyer. On September 27th, 2013, Kelly executed a one-party listing agreement with NBB. Manning received a copy of the listing agreement. Rochwarger then identified the potential buyer as Jeff Lash ("Lash"), of Lash Automotive Group and GPB ("Lash/GPB"). Manning, Rochwarger and Lash participated in a conference call in October of 2013. Lash explained that he was interested in acquiring dealerships with existing General Managers in place who were willing to retain equity in the dealership, and, therefore, that he would like Manning to continue to be employed by KellyCars as General Manager. Lash further explained that it was possible that there would be a future initial public offering at which time Manning could sell his shares for a profit.

Manning told Lash he would be willing to stay on with an appropriate Employment Agreement. During this period, Manning consulted with Paul Matvey, a Certified Public Accountant with Schneider Downs. Matvey focuses his practice in the automobile industry. Manning asked Matvey to provide him with an estimate of the value of KellyCars. Manning further asked Matvey to draft an offer to purchase KellyCars on his behalf. Matvey calculated two values for KellyCars. The first value used a multiple of three (3) times the net earnings for blue sky value. The second used a multiple of 3.5 times the net earnings for blue sky value. Matvey testified that these calculations were based on the financial information Manning provided to him. Matvey further testified that he had all the information necessary to formulate these offers. Manning never submitted these offers to Kelly. Manning did not ask Kelly for an appraisal while working with Matvey.

8

In November of 2013, Kelly received an offer to purchase the assets of the KellyCars from Lash/GPB. The offer was for $5,000,000.00. Kelly shared this offer with Manning. Manning objected to the offer on the basis that an asset purchase agreement would cause him negative tax consequences. Manning informed Kelly that he would like to present an offer to purchase the shares. Kelly refused to hear Manning's offer and told Manning that he wanted to accept the higher Lash/GPB purchase offer. Kelly then asked Lash/GPB to restructure the proposed transaction as a stock purchase.

On November 20, 2013, Lash/GPB presented Kelly with an offer to purchase Kelly's shares, which constituted 75% of the ownership of KellyCars for $4,800,000.00. Kelly shared this offer with Manning. Manning provided a copy of this offer to Matvey and to his counsel, Robert Bashaw. Manning asked Matvey to review the offer and advise him as to the tax consequences of the offer. At Kelly's direction, Manning then met with Lash, Rochwarger and Brian Marshall, the Chief Financial Officer of the GPB entities to discuss the post sale terms of his continued employment with KellyCars. Kelly executed the stock purchase offer.

On December 29th, 2013, Kelly's attorney asked Manning to waive his rights under Section 2.3 of the RSA so that the deal could go forward. Manning refused to do so. In spite of Manning's refusal to waive his rights under the RSA, on February 7th, 2014, Kelly, Lash/GPB entered into an agreement for the sale of the Kelly Shares for $4,709,134.00. The transaction was scheduled to close on April 5th, 2104.

The terms of the purchase offer required, as a condition precedent, that KellyCars and Manning enter into a new employment agreement on or before March 9th, 2014. The terms further required Manning to retain his shares in KellyCars. If Manning did not agree to a new employment agreement, the purchase offer could be terminated by Kelly. On March 5th, 2014,

9

Lash/GPB sent a proposed employment agreement to Manning. Manning refused to sign it. Shortly thereafter, Lash./GPB sent Manning a Restrictive Shareholder Agreement. The Restrictive Shareholder Agreement contained terms that were not acceptable to Manning. Manning rejected this agreement as well, but offered to sell his shares to the Lash/GPB on the same terms as they had negotiated with Kelly. Lash/GPB refused Manning's offer.

On March 20th, 2014, Kelly terminated the sale of KellyCars to Lash/GPB because they had failed to reach an agreement with Manning. On March 22nd, 2014, Kelly terminated Manning without cause effective June 20th, 2014. Manning received his salary and his other distributions during this period. By letter dated April 15th, 2014, Kelly asked Manning to return his shares. Manning refused. On June 18th, 2014, counsel for KellyCars, Inc. advised counsel for Manning that Kelly intended to purchase Manning's 125 shares for $275,000. Manning refused to sell his shares. Kelly then converted Manning's termination to "for cause" and again asked Manning to relinquish his shares. Manning again refused. Since he has been terminated, Manning has not received any further compensation or distributions from KellyCars, Inc. Manning's shares remain in the custody of his counsel.

Kelly continued his negotiations for the sale of KellyCars, Inc. following Manning's termination. Specifically, both #1 Cochran and Diehl Automotive expressed interest in purchasing KellyCars after Manning was terminated. KellyCars has not been sold.

Manning filed this action on June 16th, 2014, and contemporaneously filed a motion for a preliminary injunction. On June 19th, 2014, Manning filed an amended motion for a preliminary injunction. As noted above, a hearing was held on November 17th, 18th and 24th, 2014.

10

## III. STANDARD OF REVIEW

At issue is whether Manning has shown he is entitled to injunctive relief on his claim in Count I that Kelly violated the terms of the RSA. In order to obtain injunctive relief, Manning bears the burden of proving the following six essential prerequisites:

> The party must show: 1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect the public interest." The burden is on the party who requested preliminary injunctive relief...

Warehime v. Warehime, 860 A.2d 41, 46-47 (Pa. 2004) (citation omitted). "[I]f the petitioner fails to establish any one [prong] there is no need to address the others." County of Allegheny v. Commw., 544 A.2d 1305, 1307 (Pa. 1988).

### IV. ANALYSIS

As noted above, the sole issue before the Court at this juncture is whether Manning is entitled to injunctive relief on his claim that defendants breached the RSA. Set forth below is an analysis of each Warehime factor.

11

## A. Irreparable Harm

The purpose of a preliminary injunction is the avoidance of immediate and irreparable injury or gross injustice until the legality of the challenged action can be determined. All-Pak, Inc. v. Johnston, 694 A.2d 347, 350 (Pa. Super. Ct. 1997). In order to constitute irreparable harm, the conduct complained of must be harmful in a way that cannot be adequately compensated in money damages. The York Group, Inc. v. Yorktowne Caskets, et. al, 924 A.2d 1234, 1242 (Pa. 2007) (additional citations omitted). A loss, though monetary, is uncompensable and thus irreparable if the extent of the loss is not entirely ascertainable. Santoro v. Morse, 781 A.2d 1220, 1227-28 (Pa. Super. 2001). In the commercial context, the loss of a business opportunity may be characterized as an irreparable injury. Id. at 1228.

Based on the evidence presented, Manning has satisfied his burden of proof. The RSA granted him the right to purchase KellyCars prior to the sale of KellyCars to a third party buyer. This opportunity constitutes an intangible benefit, which is neither quantifiable nor compensable by money damages alone. If Kelly is permitted to sell KellyCars to a third party in violation of the RSA, Manning will lose his rights under the RSA permanently. Accordingly, the Court finds Manning has established the first prong of the Warhime test.

## B. Balance of Injuries

Manning must next establish that greater harm would result from refusing to grant the injunction than from granting the injunction. As set forth above, if the Court refuses to issue the injunction, Manning will forever lose his opportunity under Section 2.3 of the RSA to purchase KellyCars. In addition, in the event he is unable to purchase KellyCars, he will also lose his rights under Section 9 of the RSA to sell his shares to the third party buyer for the same consideration to be paid to Kelly. In contrast, there was no evidence presented of any harm to

12

defendants from issuing the injunction. They are not being required to sell KellyCars to Manning. Rather, they are simply being required to honor the RSA by providing Manning with a written appraisal of KellyCars and an opportunity to purchase KellyCars for that price.

### C. Return to the Status Quo

Manning must also establish is that the injunction will properly restore the parties to their status as it existed immediately prior to the wrongful conduct. Here, the wrongful conduct was Kelly's attempts to sell KellyCars to a third party without providing Manning with the opportunity to either purchase KellyCars or sell his shares for the same terms as required by the RSA. Simply put, the injunction will protect the status quo prior to the breach of contract.

### D. Likelihood of Success on the Merits

Manning also bears the burden to proof his right to relief is clear and that he is likely to prevail on the merits of his breach of contract claim. In order to establish a claim for breach of contract, a party must show: "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." J.F. Walker Co. v. Excalibur Oil Grp., Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002). A party is entitled to specific performance in a breach of contract action where the facts establish the plaintiff's right to performance, the plaintiff lacks an adequate remedy at law, and where justice so requires it. Snyder v. Brown, 518 A.2d 558, 560 (Pa. Super. Ct. 1986).

A breach must have been a material breach of the contract. Oak Ridge Construction Co. v. Tolley, 504 A.2d 1343, 1348 (Pa.Super. Ct. 1985) A material breach of contract excuses the non-breaching party from its performance obligation under the same contract. Widmer Engineering, Inc. v. Dufalla, 837 A.2d 459, 467 (Pa. Super. 2003).

13

Here, there is no dispute that the RSA is a valid contract. There is further no dispute that Kelly never provided Manning with an appraisal. And, there is no dispute that Kelly never provided Manning with written notice of his intention to sell KellyCars together with a copy of an appraisal. Accordingly, Manning has shown a substantial likelihood of success on the merits of his claim that defendants breached Sections 2.3 and 9 of the RSA.

The Court finds that the breach of the RSA was material as a matter of law. The essential purpose of the RSA was to provide Manning the opportunity to purchase KellyCars prior to any negotiations for its sale to a third party. A secondary purpose of the RSA was to allow Manning, if he was unable to purchase KellyCars himself, to sell his shares to the third party for the same price negotiated by Kelly. The conduct of the Kelly defendants effectively rendered the RSA a nullity.

Defendants contended that, despite their breach of the RSA, Manning either waived his rights under the RSA or should be estopped from claiming breach of contract. Defendants argue that because Manning made offers to purchase KellyCars without an appraisal, participated in the negotiations with the Lash/GPB group and failed to request an appraisal he should not be permitted to claim that they breached the RSA. Defendants further argue that Manning's receipt of compensation and distributions after Kelly accepted the Lash/GPB offer constitutes a waiver of his rights under the RSA.

The doctrines of waiver and estoppel are defenses to a breach of contract Claim. Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary. Prime Medica Assocs. v. Valley Forge Ins. Co., 970 A.2d 1149, 1156-57 (Pa. Super. Ct. 2009). Estoppel is "a doctrine sounding in

14

equity, [which] recognizes that an informal promise by one's words deeds, or representations which leads another to rely justifiably thereon to his own injury or detriment ..." Novelty Knitting Mills, Inc. v. Siskind, 457 A.2d 502, 503 (Pa. 1983).

Here, however, the evidence presented established that Manning did not waive his rights under the RSA. While it is true that Manning presented offers without an appraisal, his conduct did not violate or otherwise void the RSA. In fact, Manning had no duties under the RSA until the Kelly Defendants provided him with written notice of their intention to sell to a third party, together with a copy of an appraisal.

Further, the credible evidence presented indicated that Manning participated in the Lash/GPB negotiations at the direction of Kelly. Notably, after the negotiations failed, Kelly terminated Manning. In addition, the RSA did not require Manning to ask for an appraisal. Rather, it was Kelly's duty to provide Manning with an appraisal prior to entertaining offers from third parties.

Additionally, defendants effectively admitted that Manning had not waived his rights under the RSA when their attorney asked Manning to waive Section 2.3 of the RSA in December of 2013. If the Kelly Defendants had in fact believed that Manning had already waived his rights under the RSA, or acted in a way that would otherwise estop him from enforcing the RSA, no such request would have been necessary. Manning's acceptance of compensation and distributions after the breach did not waive his rights. The Kelly Defendants have not established that they relied to their detriment on Manning's conduct. Accordingly, defendants have failed to establish that Manning waived his rights under the RSA or should be estopped from seeking relief.

15

**E. The Injunction is Reasonably Suited to Restrain the Offending Activity**

The Court has concluded that Manning is likely to prevail on the merits. The injunction simply requires the Kelly Defendants to honor their obligations pursuant to the RSA. Accordingly, the injunction is reasonably suited to restrain the offending activity.

**F. The Injunction will not Adversely Affect the Public Interest**

Finally, Manning must establish that the injunction will not adversely affect the public interest. Based upon the evidence presented at the hearing, the Court concludes that issuing the injunction will have no effect on the public interest.

**G. Bond**

After review of the parties' arguments regarding the requirement that a bond be posted when granting injunctive relief, the court finds that Defendants are correct in their position that a bond is required. Therefore, with the issuance of this opinion we are also issuing an order scheduling a hearing on an appropriate bond in this case.

**V.     CONCLUSION**

For the reasons set forth above, Plaintiff's Amended Motion for A Preliminary Injunction was granted.

BY THE COURT:

Dated:

May 27th, 2015

_Christine Ward_ , J.

Christine Ward, J.

16